AO108(2/90) Application for Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

Any and all funds in Wachovia Securities, L.L.C.
Account Number xxxx-1064, held in the name of
**Patricia McLaren**

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

CASE NUMBER:

I, _____ Paul W. Cavanagh _____ being duly sworn depose and say:

I am a(n)___ Special Agent with the Federal Bureau of Investigation _ and have reason to believe
that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States,
namely (describe the property to be seized)

> Any and all funds in Wachovia Securities, L.L.C. Account Number xxxx-1064,
> held in the name of **Patricia McLaren**

which are (state one or more bases for seizure under the United States Code)

> subject to seizure, pursuant to 18 U.SC. § 981(b) as proceeds traceable to or derived from violations of
> 18 U.S.C.§ 1347(Health Care Fraud) and/or property, real or personal, involved in a transaction in violation
> of 18 U.S.C.§ 1956 (Money Laundering), or any property traceable to such property.  These funds or other
> things of value, including stock, are therefore subject to forfeiture under 18 U.S.C.§ 981(a)(1)(A) and (C).

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN

Continued on the attached sheet and made a part hereof.    ☒ YES    ☐ NO

Diane Lucas
Asset Forfeiture Unit, Criminal Division
(202) 514-8097

Sworn to before me, and subscribed in my presence

_____
Signature of Affiant
Paul M. Cavanagh, Special Agent
Federal Bureau of Investigation

at Washington, D.C.

_____
Date

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## <u>AMENDED AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT</u>

Paul M. Cavanagh, being duly sworn, deposes and states as follows:

1. On June 28, 2007 the Honorable John M. Facciola, Magistrate Judge of the United States District Court for the District of Columbia issued seizure warrants for Wachovia account # xxxx-1064 in the name of Patricia McLaren and Wachovia account # xxxx-0981 in the name of Martin McLaren.

2. Upon execution of the warrants, I learned that the name of the financial institution where the accounts were located, Wachovia, was not accurate. I have been told that the precise name of the institution where account # xxxx-1064 in the name of Patricia McLaren and account # xxxx-0981 in the name of Martin McLaren are located is Wachovia Securities, L.L.C.

3. According to the information that I was provided, Wachovia Securities, L.L.C., is a subsidiary of Wachovia Corporation. Wachovia Bank is also a subsidiary of Wachovia Corporation and is an affiliate of Wachovia Securities, L.L.C.

4. I am incorporating as if fully rewritten herein, the original affidavit for the seizure of the above two listed accounts. I have also attached hereto copies of the seizure warrants issued on June 28, 2007 by Magistrate Judge John M. Facciola.

1

5. I am requesting pursuant to the original affidavit and the amended affidavit that the court issue amended seizure warrants reflecting that the United States may seize any and all funds in the following accounts:

**Wachovia Securities, L.L.C. account xxxx-1064 in the name of Patricia McLaren**

**Wachovia Securities, L.L.C. account xxxx-0981 in the name of Martin McLaren**


_____
Paul M. Cavanagh, Special Agent
Federal Bureau of Investigation
United States Department of Justice


SWORN TO AND SUBSCRIBED before me this _____ day of July, 2007


_____
United States District Judge
_____ for the District of Columbia


2

AO108(2/90) Application for Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

Any and all funds in Wachovia Bank Account
Number _ ¹064, held in the name of
**Patricia McLaren**

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

CASE NUMBER: **0 7 - 3 2 5 - M - 0 1**

I, _____Paul W. Cavanagh_____ being duly sworn depose and say:

I am a(n) __Special Agent with the Federal Bureau of Investigation__ and have reason to believe
that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States,
namely (describe the property to be seized)

> Any and all funds in Wachovia Bank Account Number     -1064,
> held in the name of **Patricia McLaren**

which are (state one or more bases for seizure under the United States Code)

> subject to seizure, pursuant to 18 U.S.C. § 981(b) as proceeds traceable to or derived from violations of
> 18 U.S.C.§ 1347(Health Care Fraud) and/or property, real or personal, involved in a transaction in violation
> of 18 U.S.C.§ 1956 (Money Laundering), or any property traceable to such property. These funds or other
> things of value, including stock, are therefore subject to forfeiture under 18 U.S.C.§ 981(a)(1)(A) and (C).

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN

Continued on the attached sheet and made a part hereof.   ☒ YES   ☐ NO

Diane Lucas
Asset Forfeiture Unit, Criminal Division
(202) 514-8097

Signature of Affiant
Paul M. Cavanagh, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

**JUN 2 7 2007**

Date        JOHN M. FACCIOLA
            U.S. MAGISTRATE JUDGE

Name and Title of Judicial Officer

at Washington, D.C.

Signature of Judicial Officer

AO109(2/90)Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

**SEIZURE WARRANT**

Any and all funds in Wachovia Bank Account
Number        -1064, held in the name of
**Patricia McLaren**

CASE NUMBER **0 7 - 3 2 5 - M - 0 1**

TO: <u>Director, Federal Bureau of Investigation,</u> and any Authorized Officer of the United States

Affidavit(s) having been made before me by <u>Special Agent Paul M. Cavanagh</u> who has reason to believe that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States, namely
(describe the property to be seized)

Any and all funds in Wachovia Bank Account Number        -1064,
held in the name of **Patricia McLaren**

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize the property specified, if necessary by freezing the account so that no funds may be withdrawn, debited, removed, or reduced in any fashion by any person, within 10 days, serving this warrant and making the seizure ☑ (in the daytime - 6:00 A.M. to 10:00 P.M.) ☐ (at any time in the day or night as I find reasonable cause has been established) leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned U.S. Judge/U.S. Magistrate Judge, as required by law.

WACHOVIA BANK is ordered to provide the property specified to the law enforcement officer serving this warrant or, at that official's request, to freeze the property in the account so that the property may not be withdrawn, debited, removed, or reduced in any fashion by any person until further Order of this Court.

JUN 2 7 2007
Date and Time Issued

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE
Name and Title of Judicial Officer

at Washington, D. C.

*John M. Facciola*
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT

Paul M. Cavanagh, being duly sworn, deposes and states as follows:

## ITEMS TO BE SEIZED

1. This affidavit is in support of a seizure warrant for the following items:

All funds and other things of value in the following Bank and investment accounts:

**Patricia McLaren Wachovia Account #        ·1064**
**Martin McLaren Wachovia Account #        ·0981**

## AFFIANT'S EXPERIENCE

2. I am a Special Agent ("SA") employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for four (4) years. Currently, I am assigned to the Asset Forfeiture/ Money Laundering Squad in the FBI's Washington, D.C. Field Office ("WFO"). My investigative assignments include money laundering as it relates to the proceeds of bank fraud, wire fraud and mail fraud schemes, as well as, a variety of white collar and narcotic related investigations.

3. I am currently assisting other Special Agents of the FBI and United States Department of Health and Human Services in a Health Care Fraud investigation. I make this affidavit based on personal knowledge through investigative techniques and in part, upon information derived from written statements made by witnesses and other law enforcement officers, representatives of financial institutions, and a review of medical and financial records.

## PURPOSE OF APPLICATION AND LEGAL DISCUSSION

4. The Federal Bureau of Investigation, the U.S. Department of Health and Human Service ("HHS"), U.S. Office of Personnel Management- Office of the Inspector General and the

1

U.S. Department of Labor, are investigating allegations that MARTIN MCLAREN, M.D., doing

business as the Pain Management Center, has defrauded a number of health benefit programs,

including, Medicare, in violation of 18 U.S.C. § 1347 (health care fraud), and then laundered the

proceeds of his health care fraud scheme, in violation of 18 U.S.C. § 1956.

5.  This Affidavit is submitted in support of seizing funds on deposit in the above-listed

accounts by a civil seizure warrant pursuant to 18 U.S.C. § 981(b).

6.  As discussed in detail below, I have probable cause to conclude that MCLAREN

engaged in a pattern and practice of defrauding health care benefit programs and furthermore that

there is probable cause to believe that proceeds of the health care fraud scheme have been

deposited into the above listed accounts.  As the proceeds of health care fraud, in violation of 18

U.S.C. § 1347, the funds in MCLAREN's Wachovia account #     -0981 and in Patricia

McLaren's Wachovia account #     ·1064 are subject to seizure and forfeiture pursuant to 18

U.S.C. § 981(a)(1)(C), as any property, real or personal, which constitutes or is derived from

proceeds traceable to, or as property derived from an offense constituting a "specified unlawful

activity" as defined in 18 U.S.C. § 1956(c).  Further, as funds involved in money laundering, in

violation of 18 U.S.C. § 1956, the funds in these accounts are subject to seizure pursuant to 18

U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as any property, real or

personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956.

## BACKGROUND

7.  Martin R. McLaren, M.D., ("MCLAREN") is the owner of Pain Management Center

("PAIN MANAGEMENT"), located at 6475 New Hampshire Avenue, Suites 420 and 430,

Hyattsville, Maryland.  MCLAREN is a licensed anesthesiologist, specializing in pain medicine.

He operates under the entity of McLaren Anesthesia Associates, PC.  MCLAREN has patients

who reside in both Maryland and the District of Columbia.

8.  Patricia McLaren is the wife of MCLAREN.  She is also listed as an employee of the

Pain Management Center.  From records I reviewed, Patricia McLaren received substantial

payments from the business which do not appear to be warranted given MCLAREN's statement

in an interview on April 11, 2006, that she occasionally takes dictation.

9.  The evidence gathered to date shows that from January 1, 2000 to August 31, 2006,

MCLAREN defrauded various "health care benefit programs" (defined in 18 U.S.C. § 24) by

billing for medical services, when, in fact, no such services were rendered.  According to the

investigation, billing at PAIN MANAGEMENT was done at the direction of MCLAREN.  A

review of five codes that MCLAREN regularly billed health care benefit programs revealed that

these codes were falsely submitted by MCLAREN to secure reimbursement for services he

supposedly performed, but did not in fact perform.  For example, MCLAREN admitted that he

did not perform one of those procedures, myleography.  Further, there is evidence that

MCLAREN was aware that the billing submissions were false.  With respect to several of the

codes, MCLAREN knew he did not have the equipment needed to perform the procedures for

which he was billing in the office.  In other cases, MCLAREN knew he had not provided the

patient consultations that he billed for and was even told by a former billing manager that he was

submitting too high a code for office visits, thus over-billing for patient visits.  MCLAREN

responded by informing his staff that he was fine so long as there were sufficient notations in the

patients' records to supported the bill, if audited, and he continued to bill the greater code.

MCLAREN was audited by Aetna in July 2004 and informed of the results, including allegations

3

that he provided injections of pain medication that did not appear to be medically appropriate, failed to document reasons for treatment, and had medical records which contained suspicious vital signs for patients. Despite the Aetna audit, the investigation revealed that MCLAREN continued to submit false billing to health care benefit programs. The investigation also revealed that on two occasions, MCLAREN submitted bills for services which he could not have performed because he was out of the country. Moreover, according to a former billing manager, in the early morning hours of April 11, 2006, she received a telephone call from MCLAREN wherein he stated that federal officers were searching his home and he directed her and others to go to PAIN MANAGEMENT and remove computers, patient charts and medication from PAIN MANAGEMENT because he believed that federal agents were going to conduct a search warrant at PAIN MANAGEMENT. Federal agents did search PAIN MANAGEMENT. Lastly, in 2006, MCLAREN was audited by Blue Cross regarding his billing pertaining to office visits. MCLAREN asked his former billing manager and others to go to PAIN MANAGEMENT at night and change patient medical records, including removing vital signs and adding false progress notes in response to the audit.

10  The health care benefit programs ("payers") to which MCLAREN submitted false bills included the Medicare program, the District of Columbia's Medicaid program, Federal Employee Health Benefits Program (Blue Cross/Blue Shield, MailHandlers), TRICARE, Blue/Cross/Blue Shield of Illinois, Blue Cross/Blue Shield private, Aetna Insurance Company's health care benefit program ("AETNA"), Liberty Mutual and CIGNA and the United States

Department of Labor.[1]

11. MCLAREN or, at his direction, MCLAREN'S employees, used the Current Procedural Terminology ("CPT") codes to bill various health care benefit programs. CPT codes are used by health care providers to inform health care benefit programs what medical services and treatment were provided to a patient. The codes also form the basis for reimbursement by the health care benefit programs to the health care providers.

12. For portions of the time in which MCLAREN submitted fraudulent bills to various health care benefit programs, MCLAREN employed a billing manager that was a participant in the fraudulent scheme described herein.[2] According to the billing manager, MCLAREN would inform her or other staff what to bill and whether to give prescriptions by circling the CPT codes on a pre-printed "superbill" form. According to the billing manager, in order to further induce her participation in the fraud described herein, MCLAREN paid for various expensive items for her, including a luxury automobile and other items of value. MCLAREN also offered to pay the billing manager a percentage of revenue that the office generated.

13. The various health care benefit providers deposited funds into MCLAREN's business account, Bank of America account #xxxx-xxxx-7669, pursuant to his submitted bills. Bank of America account #xxxx-xxxx7669 is MCLAREN's general business account into which all funds generated by the business, including payment for false billing, were deposited.

---

[1] The figures for payments to MCLAREN from Liberty Mutual regarding the five codes are not included in the figures herein.

[2] In an April 2006 interview, MCLAREN claimed that the billing manager left his employment in 2004 because she was embezzling money from the practice. MCLAREN, however, subsequently rehired this same billing manager.

MCLAREN then transferred funds from his business account directly to other accounts he controlled, including to his personal Bank of America account #xxxx-xxxx-1887, and to investment accounts at Wachovia, including *  )981 and #  1064. MCLAREN also moved funds through a Wachovia pass-through account #  ¯ 0975 and then to his Wachovia investment accounts, including account #s  0981 and  -1064. MCLAREN further transferred funds from his Bank of America personal account #xxxx-xxxx-1887 to his and his wife's Wachovia accounts, including, *  0981 and #  !064.

14. On April 13, 2006, pursuant to a seizure warrant issued by Magistrate Judge Robinson, government agents seized $413,108.78 from MCLAREN's personal BOA account # xxxx-xxxx-1887 and $252,858.19 from MCLAREN's BOA business account #xxxx-xxxx-7669 as proceeds of health care fraud and funds involved in money laundering. On April 20, 2006, pursuant to another seizure warrant, government agents seized for forfeiture MCLAREN's 2005 Porsche Cayenne which he purchased on April 13, 2005 for $48,199. The factual basis for the previous seizure warrants was MCLAREN's submission of false billing to health care benefit providers for Myelography, Toradol injections and billing for services he could not have performed while he was in Barbados in December 2003 and November 2005. As shown below, while the government includes in this application MCLAREN's reimbursements for Myelography (CPT code 72265) and Toradol injections (CPT code J1885) which also formed the basis for the April 2006 seizures of $665, 966.97 from MCLAREN's BOA business and personal accounts (xxxx-xxxxx-1887 and xxxx-xxxx-7669) and MCLAREN's 2005 Porsche Cayenne, the government takes into consideration in this application the amount it has already seized relating to Myelography and Toradol. The investigation revealed that between January 1, 2002 and April

6

1, 2006, MCLAREN received approximately $1,348,230.83 from health care benefit programs

for Myelography which MCLAREN admitted he did not perform and $1,505,442.06 in

reimbursements relating to Toradol. Given that the government has already received

$665,966.97 in funds and the value of the 2005 Porsche Cayenne was $48,199.00, there is

probable cause to believe that unrecovered fraudulent reimbursements of $2,139,506.92 relating

to Myelography and Toradol have not been seized by the government to date.

## PROBABLE CAUSE

15. In September 14, 2005, the Office of the Inspector General of the U.S. Department of

Health and Human Services began an investigation regarding MCLAREN's billing after

receiving a referral from a program safeguard contractor working for the Medicare Program. The

contractor had conducted a proactive data analysis and determined that MCLAREN was likely

over-billing Medicare for giving Toradol, an anti-inflammatory drug that is administered orally

or by injection to patients. As part of the investigation by HHS, a number of MCLAREN's

medical records were reviewed by medical experts and all of his billing records were reviewed by

law enforcement. The investigation revealed that MCLAREN submitted false billing for medical

services that he did not provide from January 1, 2000 through August 31, 2006.

16. For purposes of this affidavit, the affiant chose five CPT codes which MCLAREN

billed to review in detail:

    a.     J1885 (Toradol);

    b.     72265 (Myelography);

    c.     64483 (Transforaminal Epidural Injection);

    d.     64484 (Transforaminal Epidural Injection); and

e.    99214 (Office Visit).

There is probable cause to believe that bills submitted by MCLAREN regarding Toradol were false because of the amounts, frequency and durations that Toradol was allegedly given, and which MCLAREN billed for, fell outside the standard of care. Moreover, MCLAREN admitted that he did not give patients the dosage of Toradol that was reflected in the records. The investigation revealed that MCLAREN never performed Myelography or Transforaminal Epidural Injection on any patient, despite billing for those procedures over and over again. The investigation also revealed that despite billing routinely for twenty-five minute office visits, MCLAREN rarely, if ever, saw a patient for more than five minutes and in fact, had his former billing manager and others alter records to include false progress notes in response to an audit regarding the office visit billing.

Toradol

17.    The affiant has probable cause to believe that MCLAREN submitted inflated bills for allegedly injecting patients with the pain medication, Ketorolac Tromethamine ("Toradol"). It is the affiant's understanding that Toradol can be administered either orally or by injection.[3] According to the 2005 Physicians' Desk Reference ("PDR"), Toradol should be administered to a patient only for short term therapy and for no more than five days with a maximum daily dosage of 120 mg. The contractor reported and Affiant confirmed that MCLAREN submitted bills seeking reimbursement for Toradol injections he claims he administered to many patients at an average dosage of 300-375 mg per patient visit for many months at a time. In an interview with

---

[3] CPT Code J1885 represents that Toradol was administered to a patient by injection. All or substantially all of MCLAREN's bills relating to Toradol used the CPT Code J1885.

8

investigating agents, MCLAREN admitted that he actually injected patients with 60 mg of

Toradol per patient visit, as opposed to the 300-375 mg for which he routinely billed. According

to reviewing medical experts, dosages of 300-375 mg of Toradol could put a patient's health at

risk. From January 1, 2002 to April 1, 2006, PAIN MANAGEMENT billed health care benefit

providers $12,404,221.84 for Toradol injections. During that period, MCLAREN received

$1,505,442.06 in reimbursements relating to Toradol injections.

Myelography

18.  MCLAREN submitted bills to various health care benefit programs pursuant to CPT

Code 72265, which relates to myelography procedures. According to interviews with multiple

doctors, myelography procedures require the use of image guidance equipment, such as a CAT

scan or X-ray machine and are usually performed in the radiology department of a hospital by a

radiologist, not by a pain management doctor. Based on multiple searches of MCLAREN's

office by various investigators no such image guidance equipment was found in MCLAREN's

office. MCLAREN had access to such image guidance equipment at a surgery center where he

had privileges, however, when interviewed on April 11, 2006, MCLAREN admitted that he does

not performed a myelography procedure. MCLAREN acknowledged billing for myelography, he

said, he actually performed epidurography procedures. MCLAREN's former billing manager in

MCLAREN'S office confirmed that MCLAREN never performed myelography procedures.

According to one of the reviewing doctors, epidurography (CPT code 72275) is also a

radiological procedure which should be performed by a radiologist. From January 1, 2002 to

April 1, 2006, PAIN MANAGEMENT billed health care benefit providers $4,094,385.98 for

Myelography procedures. During that period, MCLAREN received $1,348,230.83 in

reimbursements relating to Myelography even though he admitted he did not perform the procedures.

<u>Transforaminal Epidural Injection</u>

19. CPT Codes 64483 and 64484 represent a procedure known as Transforaminal Epidural Injection (TEI). According to reviewing doctors, this procedure requires three separate injections into the spinal region and must be performed using image guidance. The investigation determined that MCLAREN did not possess the image guidance equipment nor the appropriate needles necessary to perform TEI in his office. According to reviewing doctors, a 3 ½ or 4 inch needle is used in order to reach this area of the spine. Furthermore, according to patient files, when he billed for TEI, MCLAREN used a 1 ½ inch needle, when a 3 ½ or 4 inch needle was needed to reach this area of the spine. MCLAREN's former business manager stated that MCLAREN never performed TEI and stated that MCLAREN was aware of the requirements for the TEI procedure, as well as the fact that he never once performed that procedure. According to her, instead of performing a TEI, MCLAREN, and at his direction, his office staff, gave patients injections into the buttocks. The reviewing doctor stated that the billing codes MCLAREN used should not be used for injections into the buttocks. One reviewing doctor stated that he/she believes that the patient files he/she reviewed, reflected trigger point injections which are normally used to treat muscle spasms. During the investigation, affiant learned that MCLAREN directed that the vast majority of patients he saw in his Hyattsville office be billed for TEI. From January 1, 2002 to April 1, 2006, PAIN MANAGEMENT billed health care benefit providers $13,480,151.91 for TEI. During that period, MCLAREN received $2,954,800.44 in reimbursements relating to TEI.

10

Office Visits

20.  According to the investigation, MCLAREN used CPT code 99214 for almost all of his patients' office visits, regardless of the actual amount of time he saw the patient or whether he saw the patient at all.  According to a reviewing doctor, CPT code 99214 is the second longest office visit code for an established patient and signifies a lengthy office visit and requires a detailed medical history of the patient, a thorough physical examination and/or medical decision making of a moderate complexity.  According to the American Medical Association guidelines, CPT code 99214 represents that the office visit took at least 25 minutes of face-to-face time with the patient.  According to the reviewing doctor, MCLAREN's files warranted lesser billing codes and some did not even show vital signs in the patient notes.  According to MCLAREN's former business manager, MCLAREN almost never saw patients for more than 5 minutes, and never performed more than a rudimentary medical examination.  MCLAREN almost never took vital signs from patients, nor did he even take weight or height measurements.  MCLAREN would often see 50-60 patients a day, with an average visit lasting no more than 5 minutes.  The former billing manager said she suggested to MCLAREN that he use other CPT codes to more accurately reflect the actual length and type of the office visits; MCLAREN instructed his employees to bill CPT Code 99214 for almost all of his patients nonetheless.  MCLAREN informed his billing manager that as long as the patients' files had documentation in their files to support a claim, he could bill using that code.  According to the former business manager, in response to an audit by Carefirst Blue Cross, MCLAREN instructed the billing manager and others to alter patients' files to add false information to indicate that those patients had been subject to much lengthier examinations.  From January 1, 2002 to April 1, 2006, PAIN

11

MANAGEMENT billed health care benefit providers $2,225,187.50 for office visits. During

that period, MCLAREN received $744,035.09 in reimbursements relating to office visits.

21. During the investigation, affiant learned that MCLAREN billed health care benefit

programs for medical services which he could not have performed since he was out of the

country, in Barbados.[4]  Specifically, MCLAREN was in Barbados from December 4, 2003

through December 10, 2003.  For that time period, MCLAREN submitted or caused to be

submitted 30 claims to Medicare stating that he performed medical services personally to

different patients on December 4, 2003 through December 10, 2003.  Similarly, MCLAREN

submitted false claims to Medicare for the time period November 7, 2005 through November 10,

2005.  Again, the investigation revealed that MCLAREN was in Barbados during that period and

could not have performed the services he claimed in his submissions to Medicare.  MCLAREN

submitted or caused to be submitted approximately124 claims to Medicare claiming that he

performed medical services personally to different patients during the above time period.

### REIMBURSEMENTS

22. MCLAREN's bank records were reviewed from January 1, 2002 through April 1,

2006.  From January 1, 2002 through April 1, 2006, MCLAREN received routine

reimbursements from health care benefit programs totaling approximately $6,552,508.42 for bills

MCLAREN submitted just for these five specific CPT codes, all of which, affiant submits are

proceeds of health care fraud, in violation of 18 U.S.C. § 1347.  The United States has already

---

[4] The United States did not add figures for reimbursement during these times periods in this
application.

recovered $714,165.97 of that amount[5] pursuant to two previous seizure warrants. All of the funds MCLAREN received from the health care benefit programs, including payments based on false billing were initially deposited on a regular basis into MCLAREN's business account at Bank of America. MCLAREN falsely billed on a regular, routine basis and payments from the health care benefit programs were constantly being deposited into MCLAREN's business account at Bank of America within a few weeks of bills being processed. The following charts shows the total yearly billing submitted by PAIN MANAGEMENT and total reimbursements made to MCLAREN by the health care benefit providers for the five selected codes.

| YEAR-2002 | BILLED | REIMBURSEMENTS |
|---|---|---|
| 99214 | $263,869.24 | $84,634.25 |
| 72265 | $237,260.00 | $85,930.95 |
| 64483 | $1,017,378.94 | $195,984.44 |
| 64484 | $23,289.72 | $4,363.04 |
| J1885 | $226,885.00 | $62,637.43 |

Total Reimbursements for 2002: $433,550.11

| YEAR: 2003 | BILLED | REIMBURSEMENTS |
|---|---|---|
| 99214 | $560,142.10 | $166,870.50 |
| 72265 | $1,329,225.00 | $528,553.85 |
| 64483 | $3,245,250.16 | $653,467.33 |
| 64484 | $248,655.20 | $64,515.80 |
| J1885 | $2,903,309.00 | $463,569.05 |

---

[5] That figures also includes reimbursements relating to services that were not performed by MCLAREN while he was in Barbados and the value of the Porsche.

Total Reimbursements for 2003: $1,876,976.53

| YEAR: 2004 | BILLED | REIMBURSEMENTS |
|---|---|---|
| 99214 | $646,387.84 | $230,490.04 |
| 72265 | $1,101,461.40 | $387,062.99 |
| 64483 | $4,193,204.76 | $874,691.73 |
| 66484 | $2,095,087.76 | $494,541.53 |
| J1885 | $4,520,870.00 | $729,545.28 |

Total Reimbursements for 2004: $2,716,331.57

| YEAR: 2005 | BILLED | REIMBURSEMENTS |
|---|---|---|
| 99214 | $653,148.36 | $228,546.69 |
| 72265 | $1,426,439.58 | $346,683.04 |
| 64483 | $1,513,753.37 | $317,879.65[6] |
| 64484 | $778,832.00 | $253,614.66[7] |
| J1885 | $4,215,609.06 | $245,283.97 |

Total Reimbursements for 2005: $1,392,008.01

| YEAR-2006[8] | BILLED | REIMBURSEMENTS |
|---|---|---|
| 99214 | $101,639.96 | $33,493.61 |
| 72265 | $0.00 | $0.00 |
| 64483 | $216,800.00 | $56,893.29 |
| 64484 | $147,900.00 | $38,848.97 |

[6] Payment until June 12, 2005, then no billing until January 12, 2006 under this code.

[7] Payment until June 12, 2005, then no billing until January 12, 2006 under this code.

[8] Payments from January 1, 2006 to April 1, 2006 only.

14

| J1885 | $537,548.78 | $4,406.33 |

Total Reimbursements for 2006: $133,642.20

Thus, there is probable cause to believe that during the course of the scheme to commit health care fraud, the business account continuously contained funds derived from reimbursements for fraudulent billing.

## TRACING THE FRAUDULENTLY OBTAINED FUNDS

23. A review of bank records for the period of January 1, 2002 through April 1, 2006, revealed that MCLAREN had total deposits of approximately $13.6 million into MCLAREN's Bank of America business account in the name of McLaren Anesthesia Associates. During that same period, MCLAREN transferred approximately $13.6 million dollars from the business account to other accounts or investments. From what investigators have been able to learn, of that $13.6 million that was withdrawn or transferred from the business account approximately $2,853,719 went directly to MCLAREN's personal BOA account #xxxx-xxxx-1887, $170,716.56 went directly to Patricia Mclaren's Wachovia account ⊦     1064, and $712,987 was transferred to MCLAREN's Wachovia account ⊦     -0981.

24. A review of the bank records show that MCLAREN would routinely transfer funds from the BOA business account to the various investment and retirement accounts, including MCLAREN's BOA personal account #xxxx-xxxx-1887, MCLAREN's pass-through Wachovia account, #     )975, MCLAREN's Wachovia account #     -0981 and Patricia Mclaren's Wachovia Account     1064. During the investigation, I learned that MCLAREN directed how funds were transferred to and between the Wachovia accounts. MCLAREN's Wachovia account     ⁀0981 was supplied by his BOA business and personal accounts. For example,

MCLAREN transferred approximately $220,000.00 from his BOA personal account to his

Wachovia account #    0981 from January through April 2004.  Likewise, $412,387.75 in

significant transfers went from his BOA business account to his Wachovia account #    0981

including:

| Date | Amount |
|---|---|
| 3/31/04 | $33,485.77 |
| 5/4/04 | $33,485.77 |
| 5/10/04 | $33,400.00 |
| 6/22/04 | $44,605.77 |
| 7/22/04 | $44,605.77 |
| 8/2/04 | $55,725.77 |
| 8/23/04 | $111,325.77 |
| Total | $412,387.75 |

Similarly, Patricia McLaren's Wachovia account #    1064 was supplied either directly or

indirectly from MCLAREN's BOA business account.  For example, MCLAREN made the

following significant transfers from his BOA business account directly to Patricia McClaren's

Wachovia account   1064:

| Date | Amount |
|---|---|
| 5/4/04 | $11,961.64 |
| 6/22/04 | $56,641.64 |
| 7/22/04 | $56,641.64 |
| 8/2/05 | $45,471.64 |
| Total | $170,716.56 |

Wachovia bank records also indicate that another of MCLAREN's Wachovia accounts, account

#    0975, was used as a "pass through" account which received money from the BOA

business account and MCLAREN's BOA personal account and then later, funds were disbursed

16

to various Wachovia accounts, including, but not limited to: account #. 0981, and #1064. Bank records reveal that approximately $462,731.61 was deposited directly from MCLAREN's BOA business account #xxxx-xxxx-7669 to the Wachovia account # -0975 and $1,342,000.00 was transferred from MCLAREN's BOA personal account #xxxx-xxxx-1887 to the Wachovia pass through account -0975 and then further transferred to various accounts, including MCLAREN's Wachovia account # 0981 and Patricia McLaren's Wachovia account # 1064. For example, the following significant monetary transactions were made from MCLAREN's Wachovia pass through account # 0975 to MCLAREN's Wachovia account 0981:

| Date: | Amount |
|-------|--------|
| 12/2/03 | $67,682.09 |
| 6/29/04 | $75,000.00 |
| 7/20/04 | $20,000.00 |
| 7/30/04 | $50,000.00 |
| 8/5/04 | $50,000.00 |
| 9/15/04 | $32,725.00 |
| 9/24/04 | $41,762.89 |
| 8/8/05 | $25,000.00 |
| 4/7/05 | $100,000.00 |
| 5/19/05 | $50,000.00 |
| 7/8/05 | $25,000.00 |
| 9/30/05 | $25,000.00 |
| Total | $562,169.98 |

Likewise, MCLAREN's made the following significant transfers from the Wachovia pass through account #5528-0975 to Patricia McClaren's Wachovia account # -1064.

| Date | Amount |
|------|--------|
| 5/28/04 | $204,605.77 |
| 6/7/04 | $60,000.00 |

17

| Date | Amount |
|------|--------|
| 7/7/04 | $55,725.77 |
| 7/15/04 | $65,000.00 |
| 8/27/04 | $50,000.00 |
| 9/10/04 | $100,425.77 |
| 9/15/04 | $17,775.00 |
| 9/24/04 | $41,762.88 |
| 3/8/05 | $25,000.00 |
| 5/19/05 | $50,000.00 |
| 7/8/05 | $25,000.00 |
| 9/30/05 | $25,000.00 |
| Total | $720,295.19 |

The Wachovia bank records do not show a lot of withdrawal activity from MCLAREN's account # -0981 or # 1064. In tracing proceeds, there are different accounting methods available to the United States, including the "lowest intermediate balance" rule of accounting, where proceeds are considered to be in an account provided "the balance has not fallen below the amount of the tainted deposit." See United States v. Banco Cafetero Panama, 797 F.2d 1154 (2nd Cir. 1986). As of April 9, 2007, MCLAREN'S Wachovia Account # 0981 had approximately $1,756,876.16 and Patricia Mclaren Wachovia Account # 1064 had a balance of approximately $2,095,221.27. The following withdrawals/checks were made from Patricia McLaren's Wachovia account -1064 between January 1, 2002 and April 12, 2007.

| Date | Amount | Payee |
|------|--------|-------|
| 4/4/06 | $50,000.00 | BOA account xxxx-xxxx-1887 |
| 5/12/06 | $9,000.00 | Cash |
| 4/12/07 | $50,000.00 | unknown |

25. The following withdrawals were made from MCLAREN's Wachovia account 0981.

| Date | Amount | Payee |
|------|--------|-------|
| 4/15/04 | $1,000.00 | Wachovia xxxx-2215 |
| 4/15/04 | $1,000.00 | Wachovia xxxx-1919 |
| 4/15/04 | $500.00 | Wachovia xxxx-0977 |

18

| 4/15/04 | $500.00 | Wachovia xxxx-8500 |
| 2/4/05 | $3,000.00 | Wachovia xxxx-2215 |
| 2/4/05 | $3,000.00 | Wachovia xxxx-2219 |
| 3/10/05 | $1,000.00 | Wachovia xxxx-2215 |
| 3/10/05 | $3,000.00 | Wachovia xxxx-2215 |
| 3/10/05 | $3,000.00 | Wachovia xxxx-1919 |
| 3/10/05 | $1,000.00 | Wachovia xxxx-1919 |
| 4/4/06 | $50,000.00 | BOA xxxx-xxxx-1887 |
| 4/25/06 | $400,800.00 | Martin McLaren |
| 4/25/06 | $56,239.00 | Martin McLaren |
| 4/12/07 | $150,000.00 | unknown |

26.   I am advised that 18 U.S.C. § 981(b)(3), provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, *and may be executed in any district in which the property is found . . . ."* Accordingly, this District Court may issue and cause to be served in any other district the requested seizure warrants.

CONCLUSION

27.   There is probable cause to believe that from January 1, 2002 through April 1, 2006, MCLAREN received payments in the amount of $6,552,508.42 from health care benefit programs based on his submission of fraudulent billing.  All of those funds were initially deposited into MCLAREN's BOA business account xxxx-xxxx-7669.  Subsequently, the fraudulent funds along with other funds were transferred (in addition to other accounts) to MCLAREN's and Patricia McLaren's Wachovia accounts #     -0981 and #     -1064.  The government has already seized approximately $714,165.97 in fraud proceeds (including the value of the Porsche), the United States has yet to recover up to $5,838,342.45 in fraud proceeds.  As shown above, a large portion of the funds currently in MCLAREN's and Patricia McLaren's

19

Wachovia accounts # 0981 and # 1064 originated from MCLAREN'S BOA business and personal account and were deposited prior to the seizure of MCLAREN's BOA business and personal accounts on April 13, 2006. Furthermore, there has not been substantial withdrawal activity from the accounts. Thus, there is probable cause to believe that proceeds of health care fraud are in the accounts and, moreover that funds in these accounts constitute property that was moved to conceal its source, location or ownership and thus is funds involved in money laundering. Therefore, any and all funds in MCLAREN's and Patricia McLaren's Wachovia accounts # 0981 and # 1064 are subject to seizure and forfeiture.

Paul M. Cavanagh, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this "JUN 2 7 2007 day of June, 2007

United States District Judge
for the District of Columbia

JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

20